UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

 RAUL CORREA and GLADYS CORREA,

                     Plaintiffs,

                                              **MEMORANDUM & ORDER**
                                              20-CV-3711(EK)(MMH)

            -against-

 NEW ENGLAND LIFE INSURANCE COMPANY
 and BRIGHTHOUSE FINANCIAL, INC.,

                     Defendants.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

        Raul and Gladys Correa seek a declaratory judgment
that a life insurance policy they own remains in effect.  The
policy was issued by the New England Life Insurance Company,
which is referred to herein as "NELICO."  The Correas assert
that because they never received proper notice that the policy
would lapse for lack of payment, NELICO could not have legally
terminated the policy.

        NELICO now moves for summary judgment, arguing
primarily that the undisputed facts are sufficient to establish
a legal presumption that notice was properly mailed and received
prior to the policy's termination.  For the reasons that follow,
that motion is granted in part and denied in part.

## I.   Background[1]

The Correas purchased the life insurance policy at issue from a bankruptcy estate.  Pl. 56.1 Resp., at 24 ¶ 1.  The policy insures the lives of Wilmos and Olga Friedman.  *Id.* at 1 ¶ 1.  The Correas appear to have made a practice of buying insurance policies for investment: they own "over seventy life insurance policies."  Raul Correa Declaration ("Correa Decl.") ¶ 8, ECF No. 62-2.  They manage the policies through an entity they control called Insurance Advisors and Administrators.  *Id.* ¶¶ 4, 8.  The Correas, who reside in Florida, maintain a post office box in Miami at which they receive insurance notices. *Id.* ¶¶ 3, 6.

### A.   The Policy

NELICO issued the Flexible Premium Adjustable Variable Survivorship Life insurance policy at issue — hereinafter simply "the policy" — in 2000.  It insured the lives of two Brooklyn residents, Wilmos and Olga Friedman, for $2.3 million.  Policy at 4, 33, ECF No. 61-4.[2]  If both Friedmans died before the

---

[1] The facts in this order are drawn from the parties' submissions in connection with the motion for summary judgment, including the defendants' Local Rule 56.1 Statement ("Def. 56.1" (ECF No. 61-2)) and plaintiffs' response to this statement ("Pl. 56.1 Resp." (ECF No. 62-1)).  The Court views the facts in the light most favorable to the plaintiff.  Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.

[2] This was the face amount of the policy, but the amount actually paid would "depend on the Death Benefit Option in effect" when the last insured died and would be reduced to reflect an outstanding loan balance.  Policy at 16.

policy's "Maturity Date," the death benefit would become payable on the latter death.  Policy at 11, 16.

The original owner of the policy — and the beneficiary thereunder — was the Friedmans' son Moses.  *Id*. at 34.  The Policy allowed the transfer of ownership, as well as changes to the designated beneficiary, upon written notice to NELICO.  *Id*. at 25.  In January 2015, ownership transferred to the Correas, ECF No. 1-4, at 2, who became co-owners and co-beneficiaries.  *Id*.; ECF No. 1-3, at 5; Pl. 56.1 Resp. at 24 ¶ 1.

The policy required the payment of "annual premiums" of $45,000 for the first four years of the policy, $15,000 for years five through ten, and $0 thereafter.  Policy at 4.  It also required the payment of monthly expense charges and administrative charges.  *Id*. at 5.  The policy provided some optionality as to the timing of payments: they could be made "at any frequency agreed to by" NELICO*.  Id.* at 18.

In the ordinary course, however, the policy holder was not required to cut a check to pay premiums.  Instead, NELICO would make a monthly deduction from the policy's "cash value" on the first of every month — *if* the cash value exceeded the amount then due.  *Id*. at 19, 21.  That is, to the extent that the cash value was sufficient to cover the required premium (plus expenses and administrative charges), NELICO simply reduced the cash value of the policy by that total.

3

If, on the other hand, the cash value was insufficient to cover a monthly deduction, the Policy required NELICO to "mail a premium notice to [the owner] at [the] address on record." *Id.* 19.  It also triggered the beginning of a grace period — the owner would have "62 days from the date when the Monthly Deduction was due in which to pay a premium large enough to permit the Monthly Deduction to be made." *Id.*  But "[i]f the premium remain[ed] unpaid at the end of its 62-day grace period, the Policy [would] lapse without value." *Id.*[3]

## B.    NELICO "Terminates" the Policy

NELICO used a third-party administrator, Alliance One, to administer life insurance policies, including by mailing out notices.  Pl. 56.1 Resp. at 5 ¶¶ 15, 17.[4]  According to NELICO, Alliance One determined on June 7, 2018, that the cash value of the Correas' policy was insufficient to pay the monthly deduction due that day.  *Id.* at 10 ¶ 30.  In a sworn declaration, Leslie Kress — an employee of Alliance One — averred that Alliance One mailed the Correas a notice on June

---

[3] This sixty-two day grace period is slightly longer than the grace period required under New York law for cancellation.  *See* N.Y. Ins. Law § 3203 (requiring all life insurance policies issued in New York to provide for, at minimum, "a sixty-one day grace period").

[4] The parties dispute whether DXC Technology Company or Alliance One Services, Inc., was the administrator of the Correas' policy.  Pl. 56.1 Resp., at 5 ¶ 15.  But an uncontroverted declaration from Joshua Miller, a compliance manager at DXC, explains that DXC is the parent company of Alliance One.  Joshua Miller Declaration ("Miller Decl.") ¶¶ 1-2, ECF No. 63-2.  To avoid confusion, this order refers to the third-party administrator of the Correas' policy as Alliance One.

14, 2018.  Leslie Kress Declaration ("Kress Decl.") ¶ 13, ECF

No. 61-3.  According to Kress, that notice warned the Correas

that the policy had entered its grace period and would lapse on

August 16 unless the Correas made a payment in the amount of

$22,429.69 beforehand.  *Id.* ¶ 16.  She attached a copy of the

notice saved to Alliance One's internal systems to her

declaration as Exhibit C.  It is not, however, addressed to the

Correas by name. Instead, it shows only the words "ET AL" and

the address of the Correas' Miami P.O. box.  *See* Exhibit C

Notice, at 2, ECF No. 61-6.

The Correas maintain that they did not receive any

notice until August 17.  Pl. 56.1 Resp., 25 ¶ 8.  They attached

a copy of the notice they received in August — addressed to

"Raul Correa" — to their complaint.  *See* Exhibit 15 Notice, ECF

No. 1-16.  The parties agree that the Correas did not make the

payment demanded by the notice before August 16.  *Id*. at 14 ¶

42.

In her declaration, Kress attested that Alliance One

mailed a second notice to the Correas on August 16, informing

them that the policy had lapsed.  Kress Decl. ¶ 18.  She

attached a copy of that notice to her declaration.  Aug. 16

Lapse Notice, ECF No. 61-7.  Soon thereafter, NELICO received a

check from the Correas for $23,000.  Pl. 56.1 Resp., at 15 ¶ 44.

Because, in its view, the policy had already lapsed,

NELICO did not apply the check towards the policy, but instead refunded it to the Correas.  *Id.* at 17 ¶ 50.  Soon thereafter, NELICO sent Raul Correa a letter informing him that he would need to complete a reinstatement application if he wished to bring the policy back into effect.  *Id.* at 16 ¶ 48.  The Correas never applied to reinstate the policy — because, they maintain, the policy had never properly lapsed.  *Id.* at 16 ¶ 49.

## C.   Procedural History

The Correas filed this suit in August 2020 against NELICO and its parent company, Brighthouse Financial, Inc., invoking the court's diversity jurisdiction.  Complaint ¶ 6, ECF No. 1.[5]

The Correas assert two claims.  In Count I, they "seek a declaratory judgment that Defendants prospectively treat the Policy as remaining in full force and effect."  Complaint ¶ 71. In Count II, they seek "a declaratory judgment . . . to clarify their rights and Defendants' obligations under the Policy."  *Id.* ¶ 80.  The complaint invoked New York law in support of Count I, but a Florida statute in support of Count II.

The defendants moved for summary judgment on both claims. Defendants' Memorandum of Law ("Def. Mem.") at 6, ECF No. 61-1. Following oral argument, the Court invited the Correas to submit

---

[5] The Correas reside in Florida, NELICO is domiciled in Massachusetts, and Brighthouse is domiciled in Delaware and North Carolina.  *Id.* ¶¶ 2-5. NELICO sells insurance in New York.  *Id.* ¶ 4.

supplemental briefing "setting out their view as to which state's law governs this policy and should be applied in this case — and why."  April 1, 2024 Order.

## II.  Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that "can affect the outcome under the applicable substantive law."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).[6]  A genuine dispute is one that can "reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In performing this analysis, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party.  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  "If, in this generous light, a material issue is found to exist, summary judgment is improper."  *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999).

The moving party may establish that there is no genuine dispute "by showing that little or no evidence may be found in support of the nonmoving party's case."  *Gallo*, 22 F.3d

---

[6] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

at 1223-24 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  If the moving party meets this burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998).  However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If "no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.*

## III. Discussion

In their supplemental submission, the Correas advised — and the Court agrees — that we "should apply New York law when analyzing the [insurance] contract" at issue.  Plaintiff's Supplemental Letter ("Pl. Supp. Ltr.") at 2, ECF No. 72.  Nonetheless, they seek declarations that NELICO did not validly "lapse" — i.e., terminate — the policy under *both* New York and Florida law.  In their view, Florida law applies in addition to — rather than in place of — New York law, but solely as to the discrete issue of whether the Correas were entitled to designate a secondary addressee to receive lapse notices.  *See* Fl. Ins. Code § 627.4555.

Consequently, the Court first applies New York law to Count I, before deciding whether Florida law indeed applies to the Correas' Count II.  *See Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.").  On Count I, NELICO has not sufficiently established under New York law that the Correas received notice of the policy's lapse to garner summary judgment.  However, for the reasons discussed below, summary judgment is granted as to Count II.

## A.    Declaratory Judgment Under New York Law (Count I)

New York law required NELICO to send a lapse notice to the Correas prior to terminating the policy, and this requirement was enshrined in the policy itself.  *See* N.Y. Ins. Law § 3211(a)(1); Policy, at 19.  The defendants argue that they properly terminated the policy following nonpayment and the expiration of the grace period.  Def. Mem. at 9.  At a trial in this case, the burden of establishing the valid cancellation of the policy would rest with NELICO.  *See, e.g.*, *Abuhamra v. New York Mut. Underwriters*, 170 A.D.2d 1003, 1003 (4th Dep't 1991).

The Correas maintain that they received no cancellation notice until after the policy had already lapsed. The defendants argue, in response, that (i) they are entitled to the benefit of a New York-law "presumption of receipt," which

the plaintiffs have not adequately rebutted, and (ii) in any event they can prove actual (and timely) receipt by the plaintiffs.

1. The Defendants Have Not Established the Presumption of Receipt

a. Legal Standard

In New York, a common law "presumption of receipt" arises when a party establishes the existence of "an office practice and procedure followed by the insurers in the regular course of their business, which shows that the notices of cancellation have been duly addressed and mailed." *Nassau Ins. Co. v. Murray,* 46 N.Y.2d 828, 829 (1978).[7]  Where the presumption applies, "mere denial of receipt is insufficient" to raise a genuine dispute of fact on the issue. *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 92 (2d Cir. 2010).

Through Insurance Law Section 3211(c), New York has prescribed the type of evidence sufficient to establish the presumption in the life insurance context.  An insurance company can submit "[t]he statement of any officer, employee or agent of [the] insurer, or of any one authorized to mail such notice, subscribed and affirmed by his as true under the penalties of

---

[7] A similar presumption applies under federal law.  There, the "rule is well settled that proof that a letter properly directed was placed in a post office creates a presumption that it reached its destination in usual time and was actually received by the person to whom it was addressed." *Hagner v. United States*, 285 U.S. 417, 419 (1932) (citing cases).

perjury." N.Y. Ins. Law § 3211(c). New York state courts appear to read Section 3211(c) to prescribe the medium in which the insurance company's showing can be made, but not to alter the common-law requirements of what needs to be established. Thus, the submission must "state[] facts" that meet the common law's requirement to show "that the notice required by this section has been duly addressed and mailed." *Id.*[8]

When considering a Section 3211(c) submission, New York courts ask whether it reveals the "the office practice" in question to be "geared so as to ensure the likelihood that the notice is always properly addressed and mailed." *CIT Bank N.A. v. Schiffman*, 36 N.Y.3d 550, 556 (2021). The affirmation must speak to multiple steps in the mailing process: "how the envelopes were addressed so as to ensure that the address was correct"; how and when the envelopes were affixed with postage; and how they were "transferred to the care and custody of the United States Postal Service." *Progressive Cas. Ins. Co. v. Infinite Ortho Prods., Inc.*, 127 A.D.3d 1050, 1051-52 (2d Dep't 2015). The affiant's "personal knowledge is required only to establish regular office procedure, not the particular mailing." *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985).

---

[8] *See Matsil v. Utica First Ins. Co.*, 150 A.D.3d 982, 982 (2d Dep't 2017) (applying Section 3211(c) in conjunction with the common-law presumption); *Guckenberger v. Prudential Ins. Co. of Am.*, 472 F. App'x 69, 69-70 (2d Cir. 2012) (same); *Stein v. Am. Gen Life Ins. Co.*, 665 F. App'x 73, 75-76 (2d Cir. 2016) (same).

In *Meckel*, Citibank — acting as trustee under an indenture — claimed to have mailed a redemption notice to the holders of certain debentures.  The notice advised the holders not only of the pending redemption, but also of "their option to convert their debentures into common stock by a certain date." *Id.* at 813.  This option had substantial value: the common stock in question was trading at "more than double" the conversion price available to the holders.  *Id.* at 814.  Despite this, a number of holders failed to exercise the conversion option. They later sued, alleging that the defendants had "failed to provide adequate notice of redemption."  *Id.*

Applying New York State law, the district court granted summary judgment to the defendants, and the Second Circuit affirmed.  *Meckel v. Cont'l Res. Co.*, 586 F. Supp. 407, 409 (S.D.N.Y. 1984), *aff'd* 758 F.2d 811 (2d Cir. 1985).  The Court of Appeals held that "[p]roof of mailing [was] established by the affidavit of a Citibank employee who 'caused' the notice to be mailed, and by the affidavit and deposition of a Citibank manager who testified about the regular procedures Citibank used to mail notices." *Meckel*, 758 F.2d at 814.  First, Citibank obtained "a mailing list from a computer register," which *undisputedly* "accurately reflected" the recipient's address. *Id*. at 814-15.  Citibank then used four methods to verify that "the number of labels, envelopes, stuffed envelopes and stamped

12

envelopes conformed to the count of [addresses] as of the record date." *Id*. at 814-15.

But courts have refused to accord the presumption based on affidavits that do not sufficiently demonstrate the integrity of a defendant's process. In *Progressive Casualty*, the Second Department declined to apply the presumption based on an affidavit that did not explain "how the envelopes were addressed so as to ensure that the address was correct." 127 A.D.3d at 1051-52. The affidavit also failed to explain whether the "envelope was addressed by the automated system or by an employee," or "how and when the envelopes . . . were transferred to the care and custody of the United States Postal Service." *Id*.

Similarly, in *Riker Danzig et al. v. Premier Capital, LLC*, the presumption was not established because the affiant did not explain "how the address on the cover letter is generated or whether anyone confirms its accuracy." No. 15-CV-8293 (ALC), 2017 WL 2779709, at *6 (S.D.N.Y. June 26, 2017). "Without testimony regarding the accuracy of the address," there could be no presumption of receipt. *Id.* And in *Matter of Government Employees Insurance Company (Hartford Insurance Company)*, the Second Department declined to apply the presumption absent evidence excluding a possible mistake created by the system. 112 A.D.2d 226, 227 (2nd Dep't 1985). There, the notices showed

the addresses of both the intended addressee and their insurance broker. *Id.* The court declined to apply the presumption because there was "no proof to exclude the real possibility" that notices might "mistakenly be sent to a broker whose name and addresses appeared on the notice along with that of the insured." *Id.* at 228.

    b.   NELICO's Process

    To establish the presumption in this case, the defendants rely on the declaration from Ms. Kress — the Senior Customer Support Associate at NELICO's third-party administrator — and her deposition testimony. Kress Decl. ¶ 1; Deposition Excerpts ("Kress Dep."), ECF No. 61-12. Kress testified that it was her job "to keep the policies functioning" by "filling customer requests and "sending out forms." Kress Dep. at 12:17-25.[9]

    Kress describes the administrator's procedures in some detail. The picture that emerges is of an antiquated process, carried out by multiple computer systems that did not speak to one another and therefore required human input to bridge the gaps. The first of those is Alliance One's "VNCH" system. VNCH was programmed to monitor each policy's Net Cash Value and

---

[9] The Correas argue that Kress's testimony cannot be relied upon to establish the presumption because "she was only in training at the time" that the Correas' notice was mailed. Plaintiff's Memorandum in Opposition ("Pl. Opp. Mem."), ECF No. 62, at 14. But her level of seniority is not relevant to whether or not she has the requisite personal knowledge.

determine, each month, whether that value was adequate to satisfy the upcoming "Monthly Deduction."  Kress Decl. ¶ 8. When a cash value was insufficient, VNCH "automatically generated a Required Payment Notice indicating the amount" the policyholder had to pay, as well as the date when the Policy would lapse if payment was not made."  *Id*.  That Notice would be "electronically sent to an output queue for overnight printing in Alliance One's print center."  *Id*.

So far, so good; but cracks in the process begin to emerge here.  First, the VNCH system is responsible for printing address information on the Required Payment Notice, but it is apparently set up to fail in that task with some frequency.  One recurring error arose from the system's inability to handle longer names.  According to Kress, if a policyholder's name was "too long," the system would not simply print whatever number of characters could be accommodated.  Instead, the system would replace the *entire* name with a short, "default" identifier — the phrase "ET AL."  Kress Dep. at 43:1-17; *see also id.* 44:1-3 (Kress: "Yeah, we would see statements like that, [which] just say et al.").  Kress did not know how long was too long; asked what "limit" the system imposed on the number of characters, Kress replied, "I don't know the exact number."  Kress Dep. at 43:4-11.  But the parties agree that this error occurred in this case — on the notice that NELICO relies on, "the recipient's

name was printed as 'ET AL' instead of 'Raul Correa.'"  Kress
Decl. ¶ 13.

Alliance One's process relied on human inputs to catch
such errors.  *Id.* ¶ 9 ("During the relevant time period, the
printed Required Payment Notices were manually reviewed by
approximately three (3) associates in Alliance One's Johnstown,
PA office.").  These associates would eyeball the notices.  If a
notice was "missing information" or otherwise "looked off,"
Kress Dep. 44:4-9, the associates would consult a second system
— the Client Information File, or CIF — to perform this check.
Kress Decl. ¶ 10.  Kress conceded that this step was at the
discretion of the Associate: if "nothing appeared to be
missing," the associates did not check the Client Information
File.  Kress Dep. 44:10-14.

When an Associate concluded that an address was
incorrect, he or she "applied white correction tape over the
incorrect information and re-typed correct information onto the
tape."  Kress Decl. ¶ 10.  The record reveals no indication that
an Associate who identified an incorrect address would *update*
that address in VNCH.[10]

---

[10] Responsibility for updating *CIF* rested with a different department.
*Id.* at 58:15-59:3.  Kress testified that the (unnamed) other department would
act only if a notice was returned as "undeliverable."  *Id.* at 58:10-11.
Asked what that department did upon receiving undelivered notices, Kress
answered: "Depending, then, who was working that case, they would then go in
and start to investigate the address to see why it was undeliverable."  *Id.*
at 58:15-20.

Given the incompatible systems and the resulting manual checks, it is understandable that the process called for the whited-out address corrections to be memorialized. Thus, after applying the correction tape and typing over it, the Associate "[t]ypically" "scanned the corrected notice," saved a copy into "Alliance One's system," and "printed a clean copy for mailing." Kress Decl. ¶ 10.

The scanned copy was to be saved into a third computer system: the "BOSS" system. Kress Dep. 38:20-23. Kress confirmed that the BOSS system was siloed from CIF: "Those two do not talk to each other." Kress Dep. 26:10-12. Therefore, it appears that any addressing errors would persist, and the entire process would need to be repeated the next month in which a cash-value shortfall occurred.

Kress acknowledges that the manual address-correction process was followed only partially in this case (at best): "the reviewing associate applied correction tape to the printed June 2018 Required Payment Notice and then typed the correct name ('Raul Correa') onto the correction tape." Kress Decl. ¶ 13. But that associate "did not make a copy of the corrected June 2018 Required Payment Notice." *Id.* Instead, he or she "mailed the original" without saving a copy. *Id.* Only the "*uncorrected* June 2018 Required Payment Notice was uploaded to the BOSS system." Kress Decl. ¶ 14 (emphasis added). Kress infers that

17

an associate made the relevant correction because the notice
that the Correas filed alongside their complaint — the Exhibit
15 Notice — carries Raul's name, rather than ET AL.

To complete the process, the reviewing associate
"inserted [the notice] into an envelope." *Id.* ¶ 11.  That
envelope would be "sealed by an associate or a machine," *id.*,
though the record does not indicate why the two methods
prevailed side-by-side.  Sealed envelopes would be placed "on
carts, which were then transported into the mailroom." *Id.*
"Mailroom associates" took the envelopes to a loading dock,
where they were picked up by the United States Postal Service.
*Id.*  The USPS was responsible for stamping and delivering the
envelopes.  *Id.*

      c.   NELICO's Process Does Not Warrant the
           Presumption

At this stage, NELICO's evidence of procedure is
insufficient to establish the presumption of receipt, for two
reasons.  First, the process is set up to generate known errors
in addressing notices (as happened in this case), and then to
rectify those errors through discretionary human inputs (which
failed in this case, at least as to the requirement to
memorialize a copy of the corrected notice).  This is not a
process "geared so as to ensure the likelihood that the notice
is always properly addressed." *CIT Bank N.A.*, 36 N.Y.3d at 556.
Indeed, the Associates were tasked with rectifying the incorrect

address information only on the physical notice in front of
them.  No one, apparently, was assigned the task of correcting
the data (or functioning) of the VNCH system.  Given that, it is
perhaps unsurprising that (per Raul Correa's declaration)
Alliance One "continued sending premium notices to the former
owner" of the policy at his address in Texas for several years
after the Correas' purchase.  Correa Decl. ¶ 7.[11]

     And second, Kress's description explained how the
system addressed the *notices* — not the envelopes into which
those notices are then inserted.  There are cases in which these
addresses are one and the same — the address is printed on the
notice itself, and the notice is placed in the envelope so as to
display that address through a clear window.  *See, e.g.*,
*Preferred Mutual Ins. Co. v. Donnelly*, 111 A.D.3d 1242, 1244
(4th Dep't 2013) (according presumption to insurer that used
"envelopes with windows so that the address on the notice was
the one used for mailing"); *cf. Matter of Gov. Employees Ins.
Co.*, 112 A.D.2d at 227 ("There is no evidence to show that any
procedure was followed to ensure that notices [mailed] in window
envelopes, were handled in such a way as to ensure that the
proper address on the notice appeared in the window.").  Here,

---

[11] The Correas attached to the complaint a copy of a letter Raul Correa
sent to NELICO in January 2015, requesting that notices be sent to his P.O.
box in Miami.  ECF No. 1-6.  They also attached a copy of a lapse notice
NELICO nonetheless incorrectly sent to the former owner of the policy in
Dallas, Texas, *a full year later*.  ECF No. 1-8.

we do not know if that was the case; Alliance One merely tells us that the notices were "folded" and "inserted into an envelope."  Kress Decl. ¶ 11.

Given the obligation to draw "all permissible factual inferences in favor of the party against whom summary judgment is sought," NELICO cannot be accorded the presumption here. *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

> 2.   If the Presumption of Receipt Were Established,
>       It Has Been Rebutted

Even if the defendants' evidence was sufficient to establish a presumption of receipt based on their regular office procedure, that presumption would be rebutted by the evidence that those procedures broke down in this instance.  The presumption of receipt is rebutted if the recipient both denies receipt and shows "proof of a material deviation from an aspect of the office procedure that would call into doubt whether the notice was properly mailed."  *CIT Bank N.A.*, 36 N.Y.3d 557. "[T]he crux of the inquiry is whether the evidence of a defect casts doubt on the reliability of a key aspect of the process such that the inference" of proper mailing and receipt "is significantly undermined."  *Id.*

The requirement to scan and save a copy of the *corrected* notice is a key aspect of Alliance One's process, and the failure to follow that procedure significantly undermines

any inference of receipt.  Kress claims that the reviewing associate applied correction tape to the printed June 2018 Notice and then typed Raul Correa's name onto it.  Kress Decl. ¶ 13.  But the required memorialization of that action did not occur.  The associate "did not make [or scan] a copy of the corrected June 2018 Required Payment Notice"; he or she simply "mailed the original."  *Id.*  The version of the notice saved to the BOSS system does not include a name, only "ET AL."  ECF No. 61-6, at 2.  Thus, the basis for the presumption has been rebutted.

NELICO then argues that, with or without the presumption, it can prove that the Correas *actually* received the corrected notice.  Defendants' Reply ("Def. Rep.") at 6-7, ECF No. 63.  In support, they point to Exhibit 15 of the Correa's complaint — a Required Payment Notice addressed to Raul Correa at the Miami P.O. Box.  *See* Exhibit 15 Notice at 2.  But that document is not dated.  The notice sets out a "Due Date" of June 7, 2018, but no native indication of when it was printed or mailed.  NELICO's theory is that this is the "corrected" notice that was mailed on June 14 — the day the uncorrected notice was saved to the BOSS system.

The defendants benefit from no presumption in making this argument: instead, they face the usual summary judgment burden to show the absence of a genuine dispute.  And the

Correas dispute NELICO's theory.  In Raul Correa's sworn declaration, he swears that he did not receive the notice until August 17, 2018 — after the policy had already lapsed.  Correa Decl. ¶ 13.  The notice bears a stamp reading "Aug 17 REC'D," which provides some further support for this claim.  Exhibit 15 Notice at 2.  In the end, this is a question for a jury to resolve.

3.    The Defendants' Remaining Arguments Under New York Law Fail

The defendants make two other arguments in favor of summary judgment on the Correas' claim for a declaratory judgment in Count I.  Neither is persuasive.

a.    Termination After One Year

The defendants argue that even if they did not send a timely notice, the policy still lapsed after a year because the Correas "did not make a meaningful attempt to pay premiums after the Policy lapsed on August 16, 2018."  Def. Mem. at 21, ECF No. 61-1.  It is true that under Section 3211(a)(1), insurers are only required to provide notice prior to terminating a policy for failure to pay premiums if they terminate the policy "less than one year after such default."  N.Y. Ins. Law § 3211(a)(1).  Ultimately, "after a year of nonpayment the insurer may lapse the policy without any notice."  *Blau v. Allianz Life Ins. Co. of N. Am.*, No. 14-CV-3202, 2018 WL 949222, at *6 (E.D.N.Y. Feb.

16, 2018) (citing *Weiss v. Sec. Mut. Life Ins. Co. of N.Y.*, 45 N.Y.S.3d 169, 171 (App. Div. 2017)).

But the defendants cannot claim that lapse was proper after a year of failing to pay premiums when they also acknowledge that NELICO actively refused to accept payment proffered by the Correas.  The defendants admit that "five days after the Policy lapsed, NELICO received a $23,000 check" to cover the Correas' payment.  Def. 56.1 ¶ 44.  NELICO then "issued a check in the amount of $23,000" on October 22 to "refund the remittance" to the Correas.  *Id*. ¶ 50.  The defendants argue that the Correas' policy lapsed because they failed to make a payment — but that payment failed only due to NELICO's own refusal to accept it.  An insurance company may not "depend upon a default in which its own negligence or wrongful act contributed, and but for which a lapse might not have occurred."  *In re Preston's Will*, 29 N.Y.2d 364, 371 (1972); *see also Jakobovits v. Alliance Life Ins. Co. of N. Am.*, No. 15-CV-9977, 2017 WL 3049538, at *6 (S.D.N.Y. July 18, 2018).  This argument fails.[12]

---

[12] The defendants also argue that the Correas' "failure to pay premiums may also be construed as a repudiation or abandonment of the Policy."  Def. Mem. at 22.  They rely on the Pennsylvania Supreme Court's decision in *Walsh v. Aetna Life Ins. Co.*, 352 Pa. 429, 443 (1945).  Even assuming that repudiation would function the same way in New York, *Walsh* is distinguishable because the Correas attempted to make a payment in August of 2018 and were rejected.  *See id*. (insured repudiated the policy in part because they "made no objection to the notice of lapse, no tender of payment of premiums").

b.   Statute of Limitations

Next, the defendants argue that the New York statute of limitations bars the Correas from bringing this action. Under Section 3211(d), actions to "recover on any life insurance policy" must be "instituted within two years from the date of such default."  N.Y. Ins. Law § 3211(d).  But the Correas are not asking "to recover" any money; they seek instead a declaration that the policy remains in force.  And the time bar in Section 3211(d) does not apply to actions for a declaratory judgment.  *Weiss*, 45 N.Y.S.3d at 171 (holding that "because the instant action is one for a declaratory judgment, rather than to recover on the policy, it is not time-barred by the two year statute of limitation"); *see Halberstam v. Allianz Life Ins. Co. of N. Am.*, No. 16-CV-6854, 2017 WL 10187689, at *23 (E.D.N.Y. June 9, 2017) (PAREN).  Accordingly, this argument fails.

## B.   **Declaratory Judgment Under Florida Law (Count II)**

In their second cause of action, the Correas request a second declaratory judgment that NELICO did not validly lapse the policy — this time under Florida law.  Complaint ¶ 72-80. The Correas maintain that Florida law applies at least as to the discrete issue of designating a secondary addressee on the policy.  *See id.* ¶ 75.  Section 627.4555 of the Florida Insurance Code provides that a life insurance contract "may not be lapsed for nonpayment of premiums" unless the insurer mails a

lapse notice to both the policyowner "and to a specified
secondary addressee if such addressee has been designated" by
the policyowner.  Fl. Ins. Code § 627.4555.  It also obligates
insurers to "notify the applicant of the right to designate a
secondary addressee at the time of application for the policy."
*Id.*  However, Florida law does not govern the policy.  Even if
it did, NELICO would not have had the obligation the Correas
invoke.

     1.   <u>Choice of Law</u>

     A federal court sitting in diversity applies the
choice-of-law rules of the forum state.  *See Klaxon Co. v.
Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).  Here, the forum
state is New York, so New York choice-of-law rules govern.
Under New York choice-of-law rules, "[t]he first step in any
case presenting a potential choice of law issue is to determine
whether there is an actual conflict between the laws of the
jurisdictions involved."  *Allstate Ins. Co. v. Stolarz*, 81
N.Y.2d 219, 223 (1993).  "Where the applicable law from each
jurisdiction provides different substantive rules, a conflict of
laws analysis is required."  *Curley v. AMR Corp.*, 153 F.3d 5, 12
(2d Cir. 1998).

     Absent a controlling choice-of-law clause in the
contract at issue, New York looks to the contract's "center of
gravity."  *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d

126, 132 (2d Cir. 2018) (citing *In re Allstate Ins. Co.*, 81
N.Y.2d at 226).  This is determined by reference to "the places
of negotiation and performance; the location of the subject
matter; and the domicile or place of business of the contracting
parties." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84
N.Y.2d 309, 317 (1994).  "In disputes involving life insurance,
this approach often results in the dispute being governed by the
law of the state where the insured resided at the time the
policy was applied for." *U.S. Bank Nat'l Ass'n v. Sun Life
Assurance Co. of Canada*, No. 14-CV-4703, 2016 WL 8116141, at *11
(E.D.N.Y. Aug. 30, 2016).

Here, it is undisputed that Wilmos and Olga Friedman
(the insureds), as well as their son Moses (the original
policyowner and beneficiary), applied for the policy from
Brooklyn, New York.  Policy at 33-34.  New York's center of
gravity analysis therefore points to the application of New York
law.  Indeed, the Correas agree that the Friedmans' residence in
New York at the time they "applied for the Policy" is
"dispositive of the issue of the governing law for Count 1."
Pl. Supp. Ltr. at 2.

The Correas nevertheless maintain that Florida law
governs the discrete issue of "Plaintiffs' rights to assign a
secondary notice addressee" for the policy.  *Id.*  But New York
law "generally opposes the application of multiple states' laws

26

to a single insurance policy." *Maryland Cas. Co. v. Continental Cas. Co.*, 332 F.3d 145, 154 & n.8 (2d Cir. 2003); *Narrangansett Elec. Co. v. Am. Home Assur. Co.*, 921 F. Supp. 2d 166, 176 (S.D.N.Y. 2013) ("Having multiple states' laws apply to a single insurance policy is inconsistent with the approach preferred by New York courts."). And plaintiffs have not cited a single New York state case applying the laws of more than one state to a contract. The weight of authority is to the contrary. *See Maryland Cas. Co.*, 332 F.3d at 145 (stating that "[t]he dearth of New York cases applying the laws of more than one state to an insurance policy — or any contract — is a significant factor in our decision" to apply only New York law).

The principles guiding choice of law questions in New York similarly militate against applying both New York and Florida law to the policy. "Section 6 of the Restatement (Second) of Conflict of Laws embodies the general choice of law principles" of New York. *Zurich Ins. Co.*, 84 N.Y.2d at 318. Among those principles are "certainty, predictability, and uniformity of result," "ease in the determination and application of the law to be applied," and "the protection of justified expectations." Rest. (Second) of Conflict of Laws § 6. The First Department has relied on those principles to hold that, at least as to "liability insurance policies covering multistate risk," only the law of state of the insured's

domicile applies.  *Certain Underwriters at Lloyds, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 23 (1st Dep't 2006).  The court reasoned that the "state of the insured's domicile is a fact known to the parties at the time of contracting" and "is most likely to conform to their expectations."  *Id.*  Abiding by that simple rule has the additional benefit of "rendering the resolution of choice-of-law issues less difficult" and making it "more likely that consistent and uniform results will be reached in different cases."  *Id.*  Here, the Friedmans were domiciled in New York at the time of contracting, Policy at 33-34, and under New York choice of law principles, New York law therefore applies to the exclusion of Florida law.

> 2. <u>Florida Law Would Not Provide Relief</u>

Even if Florida law governed the contract, it would not provide the relief the Correas seek.  Section 627.455 of the Florida Insurance Code only obligates an insurer to notify applicants of their right to designate a secondary addressee "at the time of application for the policy."  Fl. Ins. Code § 627.4555.  The Correas did not apply for the policy — they purchased it on the secondary market and then notified NELICO of that purchase via a "Change of Beneficiary" form.  Change of Beneficiary Form at 5, 10, ECF No. 1-3.

Under the policy's terms, no "application" is necessary to make a change in the policy's owner or beneficiary.

The only requirements for making such a change are that it must be "in written form satisfactory to [NELICO]," and "dated and signed by the Owner who is making the change."  Policy at 25. The record shows that the Correas never applied to NELICO to make a change — they merely informed them that a change had been made by sending a Change of Beneficiary form.  An attached cover letter stated that the signed form was enclosed, and directed NELICO to "provide us with written confirmation" once changes were made in NELICO's system.  Change of Beneficiary Form at 2.

The Correas do not argue that their purchase of the policy constituted an "application" under Section 627.4555. Instead, they maintain that the statute applies because they "paid all their premiums in Florida."  Pl. Supp. Ltr. at 2. They argue that those payments "created a new contract that was performed in Florida," *id.*, citing *James v. Hartford Life & Accident Ins. Co.*, a decision from the Middle District of Florida.  No. 15-CV-1632, 2016 WL 3102211 (M.D. Fla. Feb. 8, 2016).  However, *James*'s holding is inapplicable to the Correas' policy.

In *James*, the court held that Section 627.4555 applied to a contract "that was initially issued before § 627.4555 took effect" because the contract was "renewed thereafter."  *Id.* at *3.  The court found that under Florida law, "the renewal of a contract of insurance constitutes the making of a new contract

for the purpose of incorporating into the policy changes in the statutes regulating insurance contracts." *Id.* That was relevant in *James* because the policy at issue was subject to "a term of five years" and first expired "on January 19, 1998." *Id.* The policyholder had then "renewed the Policy in five year terms" stretching from 1998 to 2013. *Id.* Under Florida law, those renewals each incorporated into the contract "policy changes in the statutes regulating insurance contracts" prior to the renewal. *Metro. Prop. & Liab. Ins. Co. v. Gray*, 446 So.2d 216, 218 (Fla. 5th DCA 1984).

The Correas' policy, on the other hand, is not subject to term periods. It states that it lasts until its maturity date — "June 7, 2035" — and is not subject to renewal. *See* Policy at 2, 4. *James* is therefore inapplicable — no "new contract" was formed, and the policy has not been renewed in Florida. For that reason, and because the Correas did not apply for the policy, Section 627.4555 is inapplicable.

### IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted as to Count II of the Correas' complaint, which is therefore dismissed. Summary judgment is denied as to Count I.

Pursuant to Rule IV.B.1 of the Court's Individual Rules in Civil Cases, the parties are directed to file a joint

proposed pre-trial order within thirty days of this order.  A status conference on the remaining count shall be held at 10:00 a.m. on November 14, 2024, in Courtroom 6G North.


          SO ORDERED.


                              __/s/ Eric Komitee_____
                              ERIC KOMITEE
                              United States District Judge


Dated:    September 30, 2024
          Brooklyn, New York